IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| DATACLOUD TECHNOLOGIES, LLC, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) C.A. No. 25-169-GBW |
| | ) |
| MEDALLIA, INC., | ) |
| | ) |
| Defendant. | ) |

## MEDALLIA, INC.'S OPENING BRIEF IN SUPPORT OF ITS MOTION TO DISMISS

OF COUNSEL:

Daniel Ravicher (*pro hac vice*)
ZEISLER PLLC
80 SW 8th St. Ste 3110
Miami, Fl 33130
(786) 505-1205
dan@zeisler-law.com

Dated: April 7, 2025

Tyler J. Leavengood (#5506)
Nicole K. Pedi (#6236)
POTTER ANDERSON & CORROON LLP
Hercules Plaza
1313 N. Market Street, 6th Floor
Wilmington, DE 19801
(302) 984-6000
tleavengood@potteranderson.com
npedi@potteranderson.com

*Attorneys for Defendant Medallia, Inc.*

# TABLE OF CONTENTS

I. NATURE AND STAGE OF THE PROCEEDINGS ..........................................................1

II. SUMMARY OF THE ARGUMENT .................................................................................1

III. STATEMENT OF FACTS ..................................................................................................1

IV. LEGAL STANDARDS .......................................................................................................1

V. ARGUMENT .......................................................................................................................2

    A.    DataCloud's '063 Infringement Claim (Count I) Must Be Dismissed Because the Sole Accused Product – Medallia Mobile 3 – was not Distributed or Available Before the '063 Patent Expired ........................................2

    B.    DataCloud's '959 Infringement Claims (Count II) are Insufficient Under the *Twombly/Iqbal* Standard ...................................................................................4

    C.    DataCloud's '298 Infringement Claims (Count III) are Insufficient Under the *Twombly/Iqbal* Standard ...................................................................................8

    D.    DataCloud's '959 Infringement Claims – If Plausible – Establish the Invalidity of the '959 Asserted Claim ..................................................................10

    E.    DataCloud's '298 Infringement Claims – If Plausible – Establish the Invalidity of the '298 Asserted Claim ..................................................................14

    F.    The Court Should not Permit a Redo .................................................................16

CONCLUSION ..............................................................................................................................16

# **TABLE OF AUTHORITIES**

**Page(s)**

**CASES**

*Ashcroft v. Iqbal*,
 556 U.S. 662 (2009) ................................................................................................................. 2

*AstraZeneca AB v. Apotex Corp.*,
 782 F.3d 1324 (Fed. Cir. 2015) ................................................................................................ 2

*Bell Atl. Corp. v. Twombly*,
 550 U.S. 544 (2007) ................................................................................................................. 2

*Bristol-Myers Squibb Co. v. Ben Venue Laboratories, Inc.*,
 246 F.3d 1368 (Fed. Cir. 2001) .............................................................................................. 10

*Kuyat v. BioMimetic Therapeutics, Inc.*,
 747 F.3d 435 (6th Cir. 2014) .................................................................................................. 16

*Lewmar Marine, Inc. v. Barient, Inc.*,
 827 F.2d 744 (Fed. Cir. 1987) ................................................................................................ 10

*Macronix Int'l Co., Ltd. v. Spansion Inc.*,
 4 F. Supp. 3d 797 (E.D. Va. 2014) ......................................................................................... 10

*Merck & Co. v. MediPlan Health Consulting, Inc.*,
 434 F. Supp. 2d 257 (S.D.N.Y. 2006) ...................................................................................... 2

*N. Star Innovations, Inc. v. Micron Tech., Inc.*,
 No. 17-506-LPS-CJB, 2017 WL 5501489 (D. Del. Nov. 16, 2017) ........................................ 4

*Peters v. Active Mfg. Co.*,
 129 U.S. 530 (1889) ............................................................................................................... 10

*Shire ViroPharma Inc. v. CSL Behring LLC*,
 2019 WL 3546692 (D. Del. Aug. 5, 2019) .............................................................................. 2

*TeleSign Corp. v. Twilio, Inc.*,
 2015 WL 12532491 (C.D. Cal. Oct. 19, 2015) ........................................................................ 7

**OTHER AUTHORITIES**

PATENT DEALERS IN AN IDEA ECONOMY. EMORY LAW JOURNAL, VOL. 56, P. 189, AT 201, 2006,
 EMORY PUBLIC LAW RESEARCH PAPER NO. 07-6, EMORY LAW ................................................ 1

## I.     NATURE AND STAGE OF THE PROCEEDINGS

DataCloud Technologies, LLC, a "patent dealer,"[1] brings this case alleging three counts of infringement of three expired patents. In Count I, DataCloud alleges that its U.S. Pat. No. 6,651,063 ("the '063 patent") is infringed by a product that did not exist until well after the '063 patent expired. In Count II, DataCloud alleges that its U.S. Pat. No. 7,209,959 ("the '959 patent") is infringed any time an Internet user makes a request to a Medallia-controlled website that includes multiple domains. In Count III, DataCloud alleges that its U.S. Pat. No. 7,398,298 ("the '298 patent") is infringed through use of web-based management of user roles and permissions.

As discussed below, none of plaintiff's three counts are plausible. As a result, the Court should dismiss the complaint under Federal Rule of Civil Procedure 12(b)(6).

## II.    SUMMARY OF THE ARGUMENT

As explained in detail below, Count I is not plausible in terms of timing. Counts II/III recite infringement theories that are implausible as plead, and, to the extent Counts II/III are viewed as plausible, their asserted claims are invalid because multi-domain websites (Count II) and web-based management of user roles and permissions (Count III) both predate the filing of the respective '959 and '298 patents.

## III.   STATEMENT OF FACTS

Medallia presents relevant facts in the argument subsections below.

## IV.    LEGAL STANDARDS

To survive a motion to dismiss, a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Specifically, a

---

[1] *See* McDonough, James F., The Myth of the Patent Troll: An Alternative View of the Function of Patent Dealers in an Idea Economy. Emory Law Journal, Vol. 56, p. 189, at 201, 2006, Emory Public Law Research Paper No. 07-6, Emory Law and Economics Research Paper No. 07-7, Available at SSRN: https://ssrn.com/abstract=959945 ("A more suitable, market-contextual term for nonpracticing patent owners who license or enforce their patents is 'patent dealers.'").

complaint must set forth sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see also Ashcroft v. Iqbal*, 556 U.S. 662 (2009). A claim is facially plausible when the factual allegations allow a court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id*. "It is now well established that both direct and indirect infringement claims are subject to the Twombly/Iqbal standard." *Shire ViroPharma Inc. v. CSL Behring LLC*, 2019 WL 3546692, at *3 (D. Del. Aug. 5, 2019) (citing *IP Commun. Solutions, LLC v. Viber Media (USA) Inc.*, 2017 WL 1312942, at *2 (D. Del. Apr. 5, 2017)).

## V.    ARGUMENT

### A.    DataCloud's '063 Infringement Claim (Count I) Must Be Dismissed Because the Sole Accused Product – Medallia Mobile 3 – was not Distributed or Available Before the '063 Patent Expired

The Federal Circuit has "long held that 'there can be no infringement once the patent expires,' because 'the rights flowing from a patent exist only for the term of the patent.'" *AstraZeneca AB v. Apotex Corp.*, 782 F.3d 1324, 1343 (Fed. Cir. 2015) (quoting *Kearns v. Chrysler Corp.*, 32 F.3d 1541, 1550 (Fed. Cir. 1994)). In other words, "an expired patent cannot be infringed." *Merck & Co. v. MediPlan Health Consulting, Inc.*, 434 F. Supp. 2d 257, 265 (S.D.N.Y. 2006) (citation omitted). But that's exactly what Count I alleges.

Count I makes a specific and unambiguous infringement charge against one product: "Defendant has infringed one or more claims of the '063 patent, either literally or under the doctrine of equivalents, because it ships, distributes, makes, uses, imports, offers for sale, sells, and/or advertises **the Medallia Mobile 3 Android app**." (D.I. 1, ¶24) (emphasis added.)

An easy and reliable way to determine approximately when an asset first appeared on the Web is to query the Wayback Machine, at https://web.archive.org. Using this publicly available archive, one can see that Google's Play Store first appeared in early 2012:



(from https://web.archive.org/web/20250000000000*/play.google.com.) And using this same publicly available archive, one can also see that the Medallia Mobile 3 android app first appeared in the Google Play Store in mid-2022:



(from https://web.archive.org/web/20220601000000*/https://play.google.com/store/apps/details?id=com.medallia.mm3.)

The '063 patent, by contrast, was filed on 01/28/2000 and expired twenty years later, on 01/28/2020. (Ravicher Dec., Ex. 1.) That's two-and-half years before the Medallia Mobile 3 android app – the accused product – first appeared on the Wayback Machine. Such time records generated by the Wayback Machine have been accepted by the United States Patent & Trademark Office, where days often matter. *See* https://www.uspto.gov/web/offices/pac/mpep/_s2128.html ("Publications obtained via the Wayback Machine® are *prima facie* deemed to be publicly

3

accessible at the date and time provided in the time stamp.").

Accordingly, because the Wayback Machine establishes that the Medallia Mobile 3 android app was not available until *years* after the '063 patent expired, DataCloud's claim that the Medallia Mobile 3 android app infringes its '063 patent (Count I) is implausible and should be dismissed.

> **B.     DataCloud's '959 Infringement Claims (Count II) are Insufficient Under the *Twombly/Iqbal* Standard**

To satisfy *Twombly/Iqbal* in a patent case, a plaintiff "needs to have pleaded facts that plausibly indicate that [the defendant's] accused products practice each of the limitations found in the … asserted claims. … After all, if it is not plausible, after reading a complaint, that the accused infringer's product reads on a limitation in the one asserted claim from a patent-in-suit, then it is not plausible that the accused infringer actually infringes the patent claim (or the patent)." *N. Star Innovations, Inc. v. Micron Tech., Inc.*, No. 17-506-LPS-CJB, 2017 WL 5501489, at *1 (D. Del. Nov. 16, 2017) (citations omitted), *report and recommendation adopted*, 2018 WL 11182741 (D. Del. Jan. 3, 2018).

In Count II, DataCloud asserts claim 1 (of the '959 patent) against Medallia. Claim 1 is a multi-step method claim that begins with, "in response to a request [] by a client to initiate communication with a destination website[.]" (D.I. 1, ¶ 35.) It then continues with a long sequence of network actions – "forwarding," "transferring," "receiving," etc. – and a similarly long sequence of network components – "server," "forwarder," "controller," "deceiver," etc. – that perform the network actions. (*Id.*)

Interestingly, the complaint cites nothing unique about Medallia's products or processes. Instead, it merely asserts that Medallia infringes because it, "support[s] multiple domain names on the same website infrastructure." (*Id.*, ¶34.) Nowhere in the complaint does DataCloud explain

why "multiple domains on the same website" matters, as nearly every website since the early-90's embodies that feature.

Paragraph 35 of the complaint details Count II's infringement charge. It reads as follows (the black text following "in response to" is the claim language, whereas the green text, colored for clarity, identifies the features of "Medallia website infrastructure" that allegedly meet the corresponding claim language):

> 35. Defendant has infringed one or more claims of the '959 Patent because Medallia website infrastructure provides a method of, in response to a request (e.g., "Client Hello") by a client to initiate communication with a destination website (e.g., access.medallia.com, ap-research.medallia.com, billing.medallia.com, blog.medallia.com, etc.), setting up a forwarding session (e.g., from the internet to a WWW server) between the client (e.g., internet device) and a destination server corresponding to the destination website (e.g., WWW server), the forwarding session employing a forwarder disposed between (e.g., a front-end server switch) the client and the destination server to forward packets sent from the client to the destination server and to forward packets sent from the destination server to the client (e.g., bilateral communications); employing the forwarder (e.g., front-end server switch), to transfer packets (e.g., ethernet or others) between the client (e.g., internet device) and the destination server (e.g., WWW server) during the forwarding session, wherein the forwarding session is set up and implemented such that neither the client or the destination server is aware of the employment of the forwarder (e.g., the WWW server has a direct TCP connection between a local IP address and a client IP address, each being different; thus, neither the client or the destination server is aware of the employment of the forwarder); employing a controller configured to communicate (e.g., firewall) with the forwarder (e.g., front-end server switch) and a domain name server (e.g., a DNS), wherein the controller queries the domain name server to resolve the name of the destination website (e.g., www.medallia.com,access.medallia.com, ap-research.medallia.com, billing.medallia.com, blog.medallia.com, etc.) associated with the destination server (e.g., WWW server) and initiates communication (e.g., between the firewall and front-end server switch) with the forwarder in response to an answer from the domain name server to resolve the name of the destination website associated with the destination server; employing a deceiver (e.g., router) configured to communicate with the controller (e.g., firewall) and the client (e.g., internet device), wherein the deceiver receives the request by the client to initiate communication (e.g., from the internet to the router) with the destination website (e.g., access.medallia.com, ap-research.medallia.com, billing.medallia.com, blog.medallia.com, etc. on a WWW server) and initiates the controller to query the domain name server to resolve the name of the destination website associated with the destination server (e.g., the router both (i) receives the request and (ii) sends the

> data from the WWW server in a manner that makes the router appear to be the source of the data, when the source of the data is actually the WWW server); and in response to the controller (e.g., router) receiving the answer from the domain name server and initiating communication with the forwarder initiating the forwarding session.

(D.I. 1, ¶ 35 (coloring added).)

When one analyzes the Count II infringement charge, several points become apparent. First, it is logically premised on the following factual assumptions:

1. That Medallia hosts various websites (access.medallia.com, etc.) on WWW servers connected to the Internet. Medallia does, indeed, maintain various websites on servers under its control.

2. That when a user accesses a Medallia website through her Internet browser, a communication of data packets occurs between her Internet browser and a Medallia-controlled server that hosts the website. Medallia agrees.

3. That "the Internet" includes routers, switches, and DNS servers – many millions of each – distributed across the globe. Here, too, Medallia agrees that there are millions of these devices and that they are connected in various ways to form the Internet.

Second, and this is where DataCloud's logic begins to break down, Count II also assumes:

4. That a request to communicate with a Medallia website that is initiated by a client traverses a particular path of Internet servers/switches/routers on its way to the Medallia-controlled server that hosts the website.

5. That Medallia somehow controls – or has an ability to control – the path that the client's request takes as it travels through the Internet on its way to Medallia's website.

Neither of these assumptions (4)-(5) is even close to correct. The paths that messages take through the internet is unknown in advance and not controllable by the sender (except in very limited circumstances not alleged by DataCloud) or by the recipient. *See, e.g.*, U.S. Patent No. 5,931,912

(Ravicher Dec., Ex. 11), "Traversal path-based approach to understanding user-oriented hypertext object usage" (originally issued to IBM, then assigned to Google), which is prior art to the '959 patent and was cited by the Examiner during prosecution ("[E]very request from a client to a server is treated independently. After the server responds to the client's request, the connection between the client and the server is dropped. There is no record of prior activities from a given client address. The server treats every request as if it were brand-new, i.e., without context.").

More importantly, for purposes of this motion, DataCloud has not pled anything that makes either of these assumptions plausible. Accordingly, DataCloud's allegation of '959 infringement is logically implausible – and should be dismissed under *Twombly/Iqbal* – because DataCloud has failed to allege any facts or reasons why either:

    i.    A request by a client to initiate communication with Medallia's website (*i.e.*, the first action in claim 1) would cause the request to travel over a specific path that includes a "front-end server switch," then a "router," then a "firewall," then finally Medallia's web server; or,

    ii.    These actions by devices on the Internet that are neither owned nor controlled by Medallia could possibly be considered "infringement" by Medallia.

Ultimately, "the question [] is not whether Defendant's services could infringe the [] patent, but rather whether it is more likely than not that Defendant's customers actually use [the accused features] in such an infringing manner." *TeleSign Corp. v. Twilio, Inc.*, 2015 WL 12532491, at \*8-9 (C.D. Cal. Oct. 19, 2015). DataCloud's pleadings offer no basis from which such required inference can be plausibly made. On the contrary, "Plaintiff's arguments that Defendant and its customers are infringing are heavy on speculation and light on evidence." *Id.* at \*9.

7

### C. DataCloud's '298 Infringement Claims (Count III) are Insufficient Under the *Twombly/Iqbal* Standard

In Count III, DataCloud accuses Medallia of infringing claim 13 of its '298 patent based on Medallia roles management, as described at Ravicher Dec., Exs. 9 (containing the content referenced at footnote 4 of the complaint) and 10 (content at footnote 5). Claim 13 contains numerous references to the concept of a "directory" (or its syntactic variants, *i.e.*, "data directory," "data directory structure," "directory structure") as highlighted in the excerpted text from DataCloud's complaint that follows. Before considering the details of DataCloud's assertion, it is helpful to first consider the concept of a "directory," as it is these "directory" limitations that turn out to be implausible under DataCloud's theory of infringement.

A "directory" is common[2] computer parlance and a familiar concept in the computer/software arts:

> "A directory is another name for a folder. File systems use directories to organize files within a storage device, such as an HDD or SSD." https://techterms.com/definition/directory

> "In computing, a directory is a file system cataloging structure that contains references to other computer files, and possibly other directories. On many computers, directories are known as folders or drawers." https://en.wikipedia.org/wiki/Directory_(computing)

In other words, "directory" is a formal term for what is commonly known as a "folder" and sometimes referred to as a "drawer." It is a structure that organizes or catalogs files.

Paragraph 45 of the complaint details DataCloud's infringement theory as to Count III. In this paragraph, which follows, DataCloud purports to identify the features of "Medallia roles management" that allegedly meet the corresponding language of claim 13. As with the previous

---

[2] DataCloud has already admitted, before this Court, that the term "directory" as used in the '298 patent does not require construction. *See* Ravicher Dec., Ex. 2 at 21 (asserting that the phrase "providing remote control of data directory structures" requires no construction).

8

excerpt, the black text following "the it provides" is the claim language, whereas the green text, which has been colored for clarity, contains DataCloud's assertions as to why the accused Medallia roles management functionality infringes:

> 45. Based upon public information, Medallia roles management meets each and every step of at least Claim 13 of the '298 Patent, either literally or equivalently. Defendant's provision of Medallia roles management has infringed and one or more claims of the '298 Patent because the it [sic] provides a method for remotely controlling ***data directory*** structures (e.g., webpages and functions accessible to discrete users through the User Management/Crowd Management module in the Admin menu, for instance) across at least one communications network (e.g., Internet) that has a computer server (e.g., WWW server), the computer server coupled to the communications network (e.g., Internet); a remote ***data directory*** structure management computing application (e.g., the Admin menu) operating on the computer server (e.g., WWW server) to process received requests for remote ***data directory*** management (e.g., adding users with roles like admin role, user role, etc.) of desired data residing in ***directory structures*** by participating users (e.g., users that have been assigned to have access rights and/or for whom access rights have been removed/banned, etc.); and a profile data store (e.g., a secure SQL server/database) comprising information relating to the data and ***data directory structures*** (e.g., information on permissions/abilities/activations available to roles) accessible to each of the participating users (e.g., of a crowd/system/organization) wherein the profile data store is queried for the ***data directory structures*** accessible to each of the participating users (e.g., role definitions indicate directory structure for each role to determine the user's permissions/abilities/activations), wherein further a single ***directory structure*** (e.g., abilities/permissions/activations for users must be selected in the User Management area of the Crowd Management menu) from among a plurality of the ***data directory structures*** associated with the profile data store (e.g., the available permissions/abilities/activations settings for users) is selected by each of the participating users for modification (the invited user can accept the invitation or access).

As one can see from the above, DataCloud's assertions regarding the "directory" limitations point to absolutely nothing that describes or references a "directory" (or "a folder," or

9

"a drawer," or "a catalog").³ Nor do they contain any assertions – plausible or not – as to why one would expect to find "directory" features as part of the accused Medallia roles management. Nor do either of the sources cited by DataCloud – Ravicher Dec., Exs. 9-10 – say anything about "directory" or "directories," "drawer" or "drawers", or "catalog" or "catalogs." Accordingly, DataCloud's assertion that Medallia roles management meets "each and every step" of claim 13 is pure speculation and, as such, deserves to be dismissed as implausible under *Twombly/Iqbal*.

### D. DataCloud's '959 Infringement Claims – If Plausible – Establish the Invalidity of the '959 Asserted Claim

As the Supreme Court explained long ago, "[t]hat which infringes, if later, would anticipate, if earlier." *Peters v. Active Mfg. Co.*, 129 U.S. 530, 537 (1889). This axiom of anticipation remains good law. *See Lewmar Marine, Inc. v. Barient, Inc.*, 827 F.2d 744, 747 (Fed. Cir. 1987).

While later decisions have limited this doctrine to literal infringement – *e.g., Bristol-Myers Squibb Co. v. Ben Venue Laboratories, Inc.*, 246 F.3d 1368, 1378 (Fed. Cir. 2001) ("it is axiomatic that that which would literally infringe if later anticipates if earlier") – this refinement makes no difference in the present case because DataCloud has not identified a single, specific element of its claims as implicating the doctrine of equivalents. *See Macronix Int'l Co., Ltd. v. Spansion Inc.*, 4 F. Supp. 3d 797, 804 (E.D. Va. 2014) (dismissing doctrine of equivalents claims plead "in a bare bones, conclusory form").

Furthermore, while it is sometimes argued that patent validity – including anticipation – cannot be decided until the Court has construed the claims, that argument would not apply here for two reasons. First, the infringement allegations that DataCloud has advanced *vis-a-vis* the '959

---

³ Notably, this contrasts with the prior-art roles management technology (discussed *infra* V.E) that addressed directory-based access privileges. *See* Rav. Dec., Ex. 7, at 196 ("By adding a user to the ACL of this directory, the role is authorized for the user.").

10

and '298 patents necessarily imply broad, "plain meaning" constructions that the Court can accept for purposes of deciding this motion. Second, DataCloud has advanced constructions for the '959 and '298 claims in other cases – including before this Court (*see* Ravicher Dec., Ex. 2 at 12-16 & 21) – and has always maintained the position that "no construction" is required. Accordingly, if it is the case that there is no material difference between the accused Medallia website infrastructure and a prior art website infrastructure, this Court should declare claim 1 of the '959 patent invalid.

The '959 patent was issued April 4, 2000, and expired twenty years later, on 04/04/2020. (Ravicher Dec., Ex. 1 at 1.) DataCloud asserts that the patent is infringed by the "Medallia website infrastructure," which it defines essentially as the servers and links accessible via a certain URL. (D.I. 1, ¶¶ 34, n.3.) Nothing about the user-observable features or behavior of Medallia's accused URL is relevant to the infringement allegations that DataCloud makes; rather, it is merely the fact that the URL exists, has various links to other URLs, and utilizes various common WWW protocols and servers/switches to support its implementation. (*Id*., ¶35.)

While the Medallia website that DataCloud accuses of infringement (https://www.medallia.com/platform/admin-suite/) only became active in 2019[4], nineteen years after the patent's filing date, other URLs/websites with identical functionality existed well before the 2020 filing date of the '959 patent. A good example, familiar to many who used the early Internet is Yahoo, whose history extends back to 1996.[5]

If one looks at the Feb. 8, 1999 archive of the Yahoo website (Ravicher Dec., Ex. 3), it shows a website and associated infrastructure (collectively, "Yahoo-99") that existed more than a year before the '959 patent's filing date. As detailed below, the Yahoo-99 website infrastructure

---

[4] *See* https://web.archive.org/web/20250000000000*/https://www.medallia.com/platform/admin-suite/.
[5] *See* https://web.archive.org/web/20250000000000*/yahoo.com.

would "infringe" the '959 patent in exactly the same way that DataCloud says that the Medallia website infrastructure does.

What follows is an element-by-element comparison of that which DataCloud accuses of infringement (in green text) with corresponding features in the prior-art Yahoo-99 website infrastructure (in red):

> 35. Based upon public information, Medallia website infrastructure meets each and every step of at least Claim 1 of the '959 Patent, either literally or equivalently. Defendant has infringed one or more claims of the '959 Patent because Medallia website infrastructure provides a method of, in response to a request (*e.g.*, "Client Hello"; this was extremely common in 1998 and would have been used by Yahoo-99 [e.g., Ravicher Dec., Ex. 6,[6] at 439 ("Web servers are responsible for servicing requests for information from Web browsers.")]) by a client to initiate communication with a destination website (*e.g.*, access.medallia.com, ap-research.medallia.com, billing.medallia.com, blog.medallia.com, etc.; Yahoo-99 had numerous such links, including yahoo.com [Ravicher Dec., Ex. 3], classifieds.yahoo.com [Ravicher Dec., Ex. 4], dailynews.yahoo.com [Ravicher Dec., Ex. 5], etc.), setting up a forwarding session (*e.g.*, from the internet to a WWW server; extremely common in 1998 and would have been used by Yahoo-99 [Ravicher Dec., Ex. 6 at 439 ("8.1.2 Web Servers")]) between the client (*e.g.*, internet device; internet devices, such as browsers, were extremely common in 1998 and would have been used to access Yahoo-99 [e.g., Ravicher Dec., Ex. 6, at 439 ("Web servers are responsible for servicing requests for information from Web browsers.")]) and a destination server corresponding to the destination website (*e.g.*, WWW server; [*id*. ("Web servers ...")]), the forwarding session employing a forwarder disposed between (*e.g.*, a front-end server switch; this is the same as a "gateway" and extremely common in 1998 [*id*. at 16]) the client and the destination server to forward packets sent from the client to the destination server and to forward packets sent from the destination server to the client (*e.g.*, bilateral communications; [*id*. at 123 ("Bidirectional communication is established between neighbors when a router sees itself listed in a hello packet received from another router.")]); employing the forwarder (*e.g.*, front-end server switch; e.g., "gateway" [*id*. at 16]), to transfer packets (*e.g.*, ethernet or others; [*id*. ("to forward packets")]) between the client (*e.g.*, internet device; [e.g., *id*. at 439 ("Web browsers")]) and the destination server (*e.g.*, WWW server; [e.g., *id*. ("Web servers")]) during the forwarding session, wherein the forwarding session is set up and implemented such that neither the client or the destination server is aware of the employment of the forwarder (*e.g.*, the WWW server has a direct TCP connection between a local IP address and a client IP address, each being different; thus, neither the client or the destination server is

---

[6] Murhammer, et al., "TCP/IP tutorial and technical overview," Oct. 1998 (Ravicher Dec., Ex. 6) is a reference that describes website infrastructures that were known and commonly used in 1998.

<span style="color:red">aware of the employment of the forwarder</span>; [*e.g.*, *id*. at 87 ("2.8.1.5 Establishing a TCP Connection")]); employing a controller configured to communicate (*e.g.*, firewall; [*id*. at 280 ("5.3 Firewalls")]) with the forwarder (e.g., front-end server switch; e.g., "gateway" [*id*. at 16]) and a domain name server (*e.g.*, a DNS; [*id*. at 150 ("4.2 Domain Name System (DNS)")]), wherein the controller queries the domain name server to resolve the name of the destination website (*e.g.*, www.medallia.com, access.medallia.com, ap-research.medallia.com, billing.medallia.com, blog.medallia.com, etc.; Yahoo-99 had numerous links, e.g., yahoo.com [Ravicher Dec., Ex. 3], classifieds.yahoo.com [Ravicher Dec., Ex. 4], dailynews.yahoo.com [Ravicher Dec., Ex. 5], etc.) associated with the destination server (*e.g.*, WWW server; [Ravicher Dec., Ex. 6, at 439 ("Web servers ...")]) and initiates communication (*e.g.*, between the firewall and front-end server switch; [*id*. at 292 ("Figure 171. Screened Host Firewall.")]) with the forwarder in response to an answer from the domain name server to resolve the name of the destination website associated with the destination server; employing a deceiver (*e.g.*, router; [*id*. at 15 ("1.2.4 Bridges, Routers and Gateways")]) configured to communicate with the controller (*e.g.*, firewall; [*id*. at 280 ("5.3 Firewalls")]) and the client (*e.g.*, internet device; [e.g., *id*. at 439 ("Web browsers")]), wherein the deceiver receives the request by the client to initiate communication (*e.g.*, from the internet to the router; [e.g., *id*. 95 ("The router has to know routes to all possible IP networks, as was the case for the Internet backbone routers")]) and the client (*e.g.*, internet device; [e.g., *id*. at 439 ("Web browsers")]) with the destination website (*e.g.*, access.medallia.com, ap-research.medallia.com, billing.medallia.com, blog.medallia.com, etc. on a WWW server; e.g., yahoo.com [Ravicher Dec., Ex. 3], classifieds.yahoo.com [Ravicher Dec., Ex. 4], dailynews.yahoo.com [Ravicher Dec., Ex. 5], etc.) and initiates the controller to query the domain name server to resolve the name of the destination website associated with the destination server (*e.g.*, the router both (i) receives the request and (ii) sends the data from the WWW server in a manner that makes the router appear to be the source of the data, when the source of the data is actually the WWW server; [Ravicher Dec., Ex. 6, at 45 ("Routers in networks not using private addresses, particularly those operated by Internet service providers, are expected to quietly discard all routing information regarding these addresses.")]); and in response to the controller (*e.g.*, router; [ *id*. at 15]) receiving the answer from the domain name server and initiating communication with the forwarder initiating the forwarding session.

(D.I. 1, ¶ 35 (coloring added).)

As is apparent, there are no differences between Medallia's website and the Yahoo-99 website that are relevant to DataCloud's infringement assertion. Similarly, DataCloud's assertions that certain components (e.g., routers) would necessarily be employed to support the website and would necessarily display certain behaviors were true to the same extent in 1998 (as shown by the IBM reference, Ravicher Dec., Ex. 6) as they are today. Claim 1 is therefore invalid as anticipated

by the Yahoo-99 website infrastructure (and untold numbers of multi-domain websites that existed prior to the '959 patent's critical date).

### E.   DataCloud's '298 Infringement Claims – If Plausible – Establish the Invalidity of the '298 Asserted Claim

Zhang, *et al.*, "Role-based access control in online authoring and publishing systems vs. document hierarchy," *Proceedings of the 17th Annual international conference on Computer documentation*, 1999 ("Zhang-99") (copy at Ravicher Dec., Ex. 7) was published more than a year before the March 29, 2002, filing date of the '298 patent's parent application. (*See* https://patentimages.storage.googleapis.com/01/de/b6/5958df1c793fc1/US7398298.pdf.) Zhang-99 therefore qualifies as prior art to the '298 patent.

As one can see from what follows, Zhang-99 is actually a much better fit to the claim than Medallia roles management (again, green highlighted text from the complaint is the Medallia functionality accused of infringing, while the red highlighted text is from the Zhang-99 prior art):

> 45. Based upon public information, Medallia roles management meets each and every step of at least Claim 13 of the '298 Patent, either literally or equivalently. Defendant's provision of Medallia roles management has infringed and one or more claims of the '298 Patent because [sic] the it provides a method for remotely controlling data directory structures (e.g., webpages and functions accessible to discrete users through the User Management/Crowd Management module in the Admin menu, for instance; [Ravicher Dec., Ex. 7, at 193 ("DAPHNE provides possibilities to support collaborative authoring on a document hierarchy that reflects the diverse branches of an enterprise's organization structure and allows diverse(documentation) information sources of an enterprise to be well structured. The role-based access control (RBAC) mechanism implemented within DAPHNE is supported by the document hierarchy as well.")]) across at least one communications network (e.g., Internet; [*id.* at 194 ("The implementation is based on the WWW platform.")]) that has a computer server (e.g., WWW server; [*id.* ("the webserver can meet the needs of access control...")]), the computer server coupled to the communications network (e.g., Internet; [*id.*]); a remote data directory structure management computing application (e.g., the Admin menu5; [*id.* at 195 ("Tab[le] 1: Role-action relationships within DAPHNE")]) operating on the computer server (e.g., WWW server; [*id.* at 194]) to process received requests for remote data directory management (e.g., adding users with roles like admin role, user role, etc.; [*id.* at 196 ("By adding a user to the ACL of this directory, the role is authorized for the user.")]) of desired data residing in directory structures by

> participating users (e.g., users that have been assigned to have access rights and/or for whom access rights have been removed/banned, etc.; [*id.* at 193 ("each role is assigned with a fixed set of actions, for instance, content examiners can examine and approve documents, a webmaster can publish documents to the Internet, and so on.")]); and a profile data store (e.g., a secure SQL server/database; [*id.* at 197 ("The associations are maintained within the relational database which DAPHNE employs.")]) comprising information relating to the data and data directory structures (e.g., information on permissions/abilities/activations available to roles; [*id.* at 196 ("By adding a user to the ACL of this directory, the role is authorized for the user.")]) accessible to each of the participating users (e.g., of a crowd/system/organization; [*id.* ("By adding a user to the ACL of this directory, the role is authorized for the user.")]) wherein the profile data store is queried for the data directory structures accessible to each of the participating users (e.g., role definitions indicate directory structure for each role to determine the user's permissions/abilities/activations; [*id.* at 194 ("to make each possible departmental area or subject field (together in DAPHNE: subject heading) to be able to be associated with the ACLs, for example, by establishing a directory for each possible area or field;")]), wherein further a single directory structure (e.g., abilities/permissions/activations for users must be selected in the User Management area of the Crowd Management menu; [*id.* at 197 ("We implemented the role hierarchy of the web documents for bank companies as: -system administrator (root role). -web-responsible (root role for document contents). -departmental manager (middle role). -author (leaf role)")]) from among a plurality of the data directory structures associated with the profile data store (e.g., the available permissions/abilities/activations settings for users; [*id.* at 195 ("They are: 1. associations between permissions and roles, that means, permissions are authorized for roles, and 2. associations between roles and users, that means, roles are authorized for users. By means of managing the two types of associations, a role-based access control system can be managed efficiently.")]) is selected by each of the participating users for modification (the invited user can accept the invitation or access; [*id.* ("document approval / content examination (accept or refuse)")]).

(D.I. 1, ¶ 45 (coloring added).). For example, consider the limitation "to process received requests for remote *data directory* management," for which:

- DataCloud asserts: "e.g., adding users with roles like admin role, user role, etc." without referencing anything;

- Whereas Zhang-99 expressly states: "By adding a user to the ACL [access control list] of this directory, the role is authorized for the user."

Accordingly, to the extent that Medallia roles management would infringe claim 13, Zhang-99 would anticipate the claim as well. The Court should declare claim 13 invalid and

15

dismiss Count III.

### F. The Court Should not Permit a Redo

DataCloud should not be permitted an opportunity to sidestep this motion by amending its complaint, as it has in other cases. DataCloud has faced *Twombly/Iqbal* challenges to its complaints in numerous cases and is therefore well aware of its defects and how they might be allegedly cured through amendment. Similarly, the fact that Medallia Mobile 3 did not exist prior to the expiration of the '063 patent is something that DataCloud could have – and should have – easily checked via www.archive.org. Therefore, DataCloud's choice to initiate this case using something less than its "best" complaint should not be excused as an unforeseeable defect.

On the contrary, the defects that DataCloud might seek to correct through amendment now were entirely predictable. *See Kuyat v. BioMimetic Therapeutics, Inc.*, 747 F.3d 435, 444 (6th Cir. 2014) ("The plaintiffs put forward no good excuse for delaying until after the district court's judgment ... the plaintiffs had access to the FDA letter ten months before they filed their post-judgment motion ... This court has previously explained that a district court 'acts within its discretion in denying a Rule 15 and a Rule 59 motion on account of undue delay—including delay resulting from a failure to incorporate previously available evidence.'") (citation omitted). In this case, DataCloud has been aware of the defects in its '959 (Count II) and '298 (Count III) infringement pleadings for almost two years. (*See* Ravicher Dec., Ex. 8 (Barracuda mot. to dis.), at 12-17.) And a trivial search of www.archive.org would have revealed that the '063 infringement claim (Count I) was unviable.

## CONCLUSION

Medallia respectfully requests that the Court dismiss all claims for failure to state a claim upon which relief can be granted under Rule 12(b)(6).

OF COUNSEL:

Daniel Ravicher (*pro hac vice*)
ZEISLER PLLC
80 SW 8th St. Ste 3110
Miami, Fl 33130
(786) 505-1205
dan@zeisler-law.com

Dated: April 7, 2025
12161118

POTTER ANDERSON & CORROON LLP

By: */s/ Nicole K. Pedi*
    Tyler J. Leavengood (#5506)
    Nicole K. Pedi (#6236)
    Hercules Plaza
    1313 N. Market Street, 6th Floor
    Wilmington, DE 19801
    (302) 984-6000
    tleavengood@potteranderson.com
    npedi@potteranderson.com

*Attorneys for Defendant Medallia, Inc.*